ORDERED in the Southern District of Florida on  12-14-10



*Raymond B. Ray*
Raymond B. Ray, Judge
United States Bankruptcy Court

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION

In re:

ROTHSTEIN ROSENFELDT ADLER, P.A.,   CASE NO.: 09-34791-BKC-RBR
                                    CHAPTER 11
    Debtor.
_____/

HERBERT STETTIN, Chapter 11 Trustee,

    Plaintiff,                       Adv. Pro. No 10-02612-BKC-RBR-A

v.

RUSSELL ADLER and KATIE ADLER,

    Defendants.
_____/

### ORDER GRANTING TRUSTEE'S MOTION FOR
### PARTIAL SUMMARY JUDGMENT ON COUNTS I AND III

**THIS MATTER** came before the court for hearing on October 26, 2010 in Fort Lauderdale, Florida on the Trustee's Motion for Partial Summary Judgment as to Counts I and III (the "Motion") [D.E. 106] seeking to avoid alleged, actual, fraudulent transfers under 11 U.S.C. § 548(a)(1)(A) and section 726.105(1)(A), Florida Statutes, the Defendants' Response and Cross-Motion in Opposition [D.E. 118], and the Trustee's Reply [D.E. 119]. Having carefully reviewed the Motion, Response and Cross-Motion, Reply, accompanying documents, legal authority cited therein, and upon hearing argument of counsel, the court makes the following

findings of fact and conclusions of law.

## INTRODUCTION

The Trustee ("Plaintiff") commenced this case against the Defendants on February 8, 2010 [D.E. 1]. The Plaintiff thereafter amended his complaint on February 11, 2010 (the "Amended Complaint") [D.E. 4] to assert ten counts against the Defendants, some against Mr. Russell Adler, individually, and the remainder, jointly against Mr. Adler and his wife, Miss Katie Adler. The first six counts are to avoid alleged fraudulent transfers, the seventh alleges breach of fiduciary duty against Mr. Adler, the eighth count seeks payment from the Defendants on a promissory note, and counts nine and ten are prayers for a constructive trust or the imposition of an equitable lien against a New York cooperative apartment owned by the Defendants. On June 18, 2010, the Defendants filed their Answer and Affirmative Defenses [D.E. 67]. They admit to receiving compensation and various loans from the Debtor ("RRA") within the relevant statutory time periods.

The Plaintiff now seeks summary judgment on Counts I and III of his Amended Complaint alleging that certain transfers of RRA, and money received by Mr. Adler and the Defendants collectively, were intentionally made by RRA to hinder, delay or defraud its creditors and are, thus, avoidable pursuant to the "actual" fraud provisions found in 11 U.S.C. § 548(a)(1)(A) and the Florida counterpart, section 726.105(a)(1), Florida Statutes, made applicable to this adversary proceeding pursuant to 11 U.S.C. § 544.

## STANDARD FOR SUMMARY JUDGMENT

Under Rule 56 of the Federal Rules of Civil Procedure, incorporated into bankruptcy proceedings by Rule 7056 of the Federal Rules of Bankruptcy Procedure, summary judgment is proper if the pleadings, depositions, together with any affidavits, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, and any affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 322. The burden then shifts to the non-moving party to designate specific facts showing that there is a genuine issue of material fact. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115–16 (11th Cir. 1993). The non-movant must present "substantial evidence" to overcome the motion, and the court must analyze "the evidence presented through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).

## UNDISPUTED FACTS

Nearly all facts relating to the Plaintiff's *prima facie* case are undisputed. The facts in this case come from the following sources: (1) the Defendants' Answer [D.E. 67] to the Plaintiff's Amended Complaint; (2) the criminal proceedings of Scott W. Rothstein and Debra Villegas;[1] (3) the affidavits and exhibits of attached to the Motion and Reply; and (4) the affidavit and exhibits attached to the Response and Cross-Motion.

### 1. The Defendants' Answer.

The Defendants' Answer [D.E. 67] to the Amended Complaint admits that the Defendants received the transfers in question from RRA during the relevant statutory time periods. The Answer also agrees with the two categories of transfers that the Plaintiff seeks to recover: (a) excess compensation paid by RRA to the Defendants; and (b) loans from RRA to the Defendants (collectively, the "Transfers").[2]

---

[1] This Court has previously ruled that "a bankruptcy judge may take judicial notice of the records on file before the court, as well as the relevant records of other courts both within and outside of the federal system." *In re Loe*, 2007 WL 997581 at *1 (Bankr. S.D. Fla. Mar. 29, 2007). Accordingly, the Court takes judicial notice of the criminal Information [D.E. 1], the Plea Agreement [D.E. 69], and the Judgment [D.E. 290] filed in *United States v. Rothstein*, 09-60331-JIC (S.D. Fla. 2009), as well as the information [D.E. 1], and plea agreement [D.E. 20-2] filed in *United States v. Villegas*, 10-60126-WJZ (S.D. Fla. Apr. 27, 2010). These records were submitted by the Plaintiff as exhibits in this adversary proceeding. *See* [D.E. 106, 119].

[2] Mr. Adler received $317,307.59 in compensation in 2007 and the Plaintiff seeks to recover $17,307.59. [D.E. 4 and D.E. 67 at ¶ 22]. In 2008 Mr. Adler received compensation including both salary and bonuses of $804,999.78 and the Plaintiff seeks to recover $504,999.78. [D.E. 4 and D.E. 67 at ¶ 23]. For the first ten months of 2009, until RRA ceased to operate, Mr. Adler received $307,692.14 and the

3

### 2. Rothstein's Criminal Information and Plea Agreement.

In the Criminal Case, on December 1, 2009, Scott W. Rothstein, was charged in five count Information by the Federal Government with operating a $1.2 billion Ponzi scheme. [D.E. 106 at *17-33]. The Information against Rothstein contains several statements that explain the role that RRA had in the scheme. The Information defines RRA as a "criminal enterprise" and states that Rothstein "did knowingly conduct and participate, directly and indirectly, in the conduct of the affairs of [RRA] through a pattern of racketeering activity . . . . " [*Id.* at *18]. Moreover, "the principal purpose of the racketeering conspiracy was to generate money for the defendant and his co-conspirators through the operation of [RRA] and through various criminal activities, including mail fraud, wire fraud, and money laundering." [*Id.* at *19]. The criminal activity that Rothstein orchestrated was conducted through the "base of operations at the offices of [RRA]." [*Id.*].

The Information also explicitly calls Rothstein's crime a "Ponzi scheme" when it notes that Rothstein utilized RRA "to unlawfully obtain approximately $1.2 billion from investors by fraud in connection with an investment scheme commonly known as a 'Ponzi' scheme." [*Id.*]. The information goes on to explain that the purpose of the Ponzi was "to personally enrich [Rothstein and other co-conspirators] and to supplement the income and sustain the daily operation of [RRA]." [D.E. 106 at *21]. In order to achieve this purpose "Rothstein and other co-conspirators utilized the offices of [RRA] and the offices of other co-conspirators to convince

---

Plaintiff seeks to recover $57,692.14. [D.E. 4 and D.E. 67 at ¶ 24].
    The loans made from RRA to the Defendants have two components—those transfers made in connection with the purchase of the New York apartment ("Apartment Transfers") and certain cash outlay transfers ("Cash Transfers"). The Defendants received a total $475,000 in connection with the Apartment Transfers. [D.E. 106 at *98-99, 108-09]; [D.E. 4 and D.E. 67 at ¶ 8]. As part of the Apartment Transfers, the Defendants signed a promissory note in favor of RRA for $47,500 of the total amount of the Apartment Transfers. At or about the same time that the Defendants received the Apartment Transfers, Mr. Adler also received a $100,000 year increase in his salary from RRA. [D.E. 4 and D.E. 67 at ¶ 28].
    In addition to the Apartment Transfers, the Defendants received a total of $220,000 in Cash Transfers. Of the $220,000 received by the Defendants, $180,000 remains unpaid. The Defendants received the Cash Transfers as follows: (a) $25,000 in 2006, (b) $20,000 in 2007, (c) $65,000 in 2008, and (d) $110,000 in 2009 of which $70,000 remains unpaid. [D.E. 4 and D.E. 67 at ¶ 27].
    In sum, the Plaintiff seeks to avoid a total of $1,234,999.51, comprising $579,999.51 in excess compensation and $655,000 in loan related transfers.

potential investors of the legitimacy and success of the law firm, which enhanced the credibility of the purported investment opportunity." [Id. at *21]. Among RRA's direct assets that were utilized were the trust accounts that RRA owned and maintained. [D.E. 106 at *23-25].

Notwithstanding the Ponzi scheme involving so called "investors," Rothstein also "initiated and conducted a scheme to defraud clients of [RRA] in order to perpetuate the Ponzi scheme." [Id. at *26]. This scam involved the use of RRA's bank accounts. [Id. at *27]. This scam, involving the elaborate preparation of fake court documents and law firm bank accounts, would not have been possible without the existence of RRA as a law firm and its clients. [Id. at *26-27].

> Finally, the Information explains that RRA relied upon the Ponzi scheme
>
> to supplement and support the operation and activities of RRA, to expand RRA by the hiring of additional attorneys and support staff, to fund salaries and bonuses, and to acquire larger and more elaborate office space and equipment in order to enrich the personal wealth of persons employed by and associated with [RRA].

[Id. at *27]. The Ponzi funds were used to

> pa[y] large bonuses to employees of RRA purportedly as an award for exemplary work. Prior to the receipt of the bonuses, the employees were instructed to make large contributions to political candidates in the employees' names. Such conduct was designed to conceal the true source of the contribution and to illegally circumvent campaign finance laws.

[Id. at *28]. In addition to the bonuses, Rothstein "distributed lavish gifts including exotic cars, jewelry, boats, loans, cash and bonuses to individuals and members of RRA in order to engender goodwill and loyalty and to create the appearance of a successful law firm." [Id.].

On January 27, 2010, Rothstein pled guilty to all counts in the Information. [D.E. 106 at *53–67]. In his Plea Agreement Rothstein acknowledged that RRA was indeed a criminal enterprise that was used to conduct a pattern of racketeering activity. [Id. at *61]. He also stated that he "relied upon the purported success of RRA, the existence of actual RRA civil matters and his standing in the community to lure potential investors in order to convince them to make such investments." [Id. at *62]. Aside from relying upon the "success" of RRA,

Rothstein also used the trust accounts established and maintained by RRA at various financial institutions "in order to receive the investor funds and to give the appearance of legitimacy and security." [*Id.* at *63]. Finally, Rothstein stated that he used the Ponzi scheme to

> supplement and support the operation and activities of RRA, to expand RRA by the hiring of additional attorneys . . . to fund salaries and bonuses, and to acquire larger and more elaborate office space and equipment in order to promote the ongoing scheme and to enrich the personal wealth of persons employed by and associated with RRA.

[*Id.* at *61].

### 3. Rothstein's Sentencing.

On June 9, 2010 after accepting Rothstein's Plea Agreement the district court sentenced Rothstein to fifty (50) years in federal custody. [D.E. 106 at *68-69]. At Rothstein's sentencing, Judge James I. Cohn made several findings regarding the role that RRA played in facilitating the Ponzi Scheme. In particular he noted that "[t]his case is about the selling of fake financial products. The marketing, however, was anything but simple. It was sophisticated rivaling that of Madison Avenue's advertising elite. It was all about image, wealth, power, and influence, WPI." [D.E. 119 at *71]. Judge Cohn also noted the importance of RRA to Rothstein's crimes when he stated that "[t]he marketing component of the fraud focused on attracting investors with deep pockets. Mr. Rothstein displayed all of the trappings of success, the multi-million dollar homes, the expensive cars, the boats, the restaurants, the jewelry, and a 70-lawyer law firm that appeared to be thriving." [*Id.* at *71-72] Finally, he noted the correlation between the political contributions made by members of RRA and the firms brand when he found that "[t]he political contributions which were funneled through the law firm's attorneys, their wives, and other employees placed the Rothstein brand in much demand." [*Id.* at *72]

### 4. Other sources.

The Affidavit of the Plaintiff states that: (a) "the expenses of the law firm were in excess of the revenues generated from legal work;" (b) "the funds from the Ponzi scheme and the legitimate law firm funds were commingled in law firm owned bank accounts;" and (c) "the

6

transfers received by the [the Defendants] fall into the category of transfers made from RRA accounts that Rothstein admitted making in furtherance of his Ponzi scheme." [D.E. 106 at *98-99]. Attached to the Affidavit is a copy of a $427,500 wire transfer which was used by the Defendants to fund the purchase of their New York apartment, as well as the check made payable to Mr. Adler for $47,500 that was used as part of the purchase. [Id. at *108, 109].

Debra Villegas, RRA's Chief Operating Officer, plead guilty to one count of conspiracy to commit money laundering. [D.E. 119 at *83-93]. In her plea agreement, Villegas acknowledged that "a co-conspirator [Rothstein] distributed lavish gifts, including exotic cars, jewelry, boats, loans, cash and bonuses, to individuals and to members of RRA in order to engender goodwill and loyalty and to create the appearance of a successful law firm." [Id. at *92]. She admitted that "[c]o-conspirators relied upon the purported success of RRA, the existence of actual RRA civil matters and the reputation of the law firm in the community to lure potential investors . . . ." [Id. at *118].

## UNDISPUTED ISSUES

The Plaintiff's *prima facie* case on Counts I and III[3] is governed by 11 U.S.C. § 548(a)(1)(A). To prevail on a claim under section 548(a)(1)(A), the Plaintiff must establish the following elements by a preponderance of the evidence: (1) a transfer; (2) of an interest of the debtor in property; (3) within the statutory time period; (4) made by the debtor with actual intent to hinder, delay, or defraud any current or future creditor of the debtor. *Fransen v. Nicassio Corp. (In re Metro Sewer Servs., Inc.)*, 374 B.R. 316, 324 (Bankr. M.D. Fla. 2007) (*citing Kapila v. WLN Ltd. P'ship (In re Leneve)*, 341 B.R. 53, 56 (Bankr. S.D. Fla. 2006)).

After questioning by the Court at the hearing, Counsel for the Defendants agreed that there is no dispute with respect to the first three elements of the Plaintiff's *prima facie* case.

---

[3]   Section 548 of the Bankruptcy Code and section 726.105, Florida Statutes, are substantially the same, with the result that "the analysis of what must be shown to prove actual fraud under both the bankruptcy and state law fraudulent transfer provisions is the same." *Bauman v. Bliese (In re McCarn's Allstate Fin., Inc.)*, 326 B.R. 843, 849 (Bankr. M.D. Fla. 2005); *see Menchise v. Clark (In re Dealers Agency Servs., Inc.)*, 380 B.R. 608, 612 (Bankr. M.D. Fla. 2007). Under section 726.105(1)(a), Florida Statutes, a trustee may recover transfers that occurred within the four years preceding the petition date.

[D.E. 128 at *21]. Accordingly, there is no dispute that the Plaintiff has proven that: (1) there was a transfer; (2) of an interest of the debtor in property; (3) within the statutory time period. The only issue for this Court to resolve on summary judgment is the fourth element—whether the Transfers were made by RRA with actual intent to hinder, delay, or defraud any current or future creditor RRA.

## CONCLUSIONS OF LAW

Under section 548(a)(1)(A), any transfer made by the debtor with actual intent to hinder, delay or defraud creditors may be avoided whether or not the debtor received value in exchange for the transfer. See *Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P. (In re Bayou Gp., LLC)*, 396 B.R. 810, 826 (Bankr. S.D.N.Y. 2008), *aff'd and rev'd in part by, Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Gp., LLC)*, 2010 WL 3839277, at *14 (S.D.N.Y. Sept. 17, 2010). Actual fraudulent transfer claims under section 548(a)(1)(A) hinge on the intent of the debtor in making the transfer. *In re Bayou Gp., LLC*, 2010 WL 383927, at *14. The intent of the transferee is not relevant except under the "good faith" defense of section 548(c), upon which the Plaintiff has not sought summary judgment.

> While the issue of fraudulent intent often cannot be resolved on a motion for summary judgment, because there is a factual question involving the parties' states of mind, actual fraudulent intent . . . may . . . be established as a matter of law in cases in which the debtor runs a Ponzi scheme or a similar illegitimate enterprise, because transfers made in the course of a Ponzi operation could have been made for no purpose other than to hinder, delay or defraud creditors.

*In re Bayou Gp. LLC*, 2010 WL 3839277, at *14 (citations and quotations omitted). Indeed, "bankruptcy courts nationwide have recognized that establishing the existence of a Ponzi scheme is sufficient to prove a Debtor's actual intent to defraud." *In re McCarn's Allstate Fin., Inc.*, 326 B.R. at 850; see *Sec. Inv. Prot. Corp. v. Old Naples Sec., Inc. (In re Old Naples Sec., Inc.)*, 343 B.R. 310, 319–20 (Bankr. M.D. Fla. 2006); *Cuthill v. Greenmark, LLC (In re World Vision Entm't, Inc.)*, 275 B.R. 641, 656 (M.D. Fla. 2002); *McHale v. Boulder Cap. LLC (In re 1031 Tax Gp., LLC)*, 2010 WL 3369944, at *21 (Bankr. S.D.N.Y. Aug. 27, 2010). Criminal plea agreements are admissible to establish the existence of a Ponzi scheme and a wrongdoer's

8

fraudulent intent. *See Johnson v. Neilson (In re Slatkin)*, 525 F.3d 805, 811–12 (9th Cir. 2008). Further, "criminal convictions based on operating a Ponzi scheme establish fraudulent intent for the purposes of the fraudulent transfer provisions." *In re Old Naples Sec., Inc.*, 343 B.R. at 320.

The Defendants contend that the Plaintiff improperly seeks to impute the guilty plea of Rothstein to RRA with respect to the issue of whether RRA had "actual intent to hinder, delay or defraud" its creditors by making the transfers. This Court disagrees.

The admissions contained in Scott Rothstein's Information and Plea Agreement may be imputed to RRA for purposes of establishing that RRA had the actual intent required under section 548(a)(1)(A). As a principal of RRA, when Rothstein pleaded guilty to the Information, he admitted to each and every allegation contained therein. The Information alleged that the Ponzi scheme operated through RRA, including through RRA's offices, bank accounts, and clients. Rothstein's Plea Agreement acknowledged that RRA was used to conduct the Ponzi scheme. He relied on the success of RRA to lure in potential investors. Likewise, one of Rothstein's top lieutenants, Debra Villegas, the Chief Operating Officer of RRA, has admitted to her role in the Ponzi scheme. Villegas admitted that Rothstein distributed lavish gifts to members of RRA in order to create the appearance of RRA's success. Further, Judge Cohn's findings at Rothstein's sentencing establish that RRA was involved in the Ponzi scheme. Therefore, the Rothstein and Villegas criminal cases and the pleadings therein establish the existence of a clear Ponzi scheme. Since the Plaintiff has established the existence of a Ponzi scheme operated through RRA, it is appropriate to apply the "Ponzi scheme presumption" to all of the transfers made to the Defendants in connection with the Ponzi. The Transfers made to the Defendants fall within the categories of transfers that helped perpetuate and prolong the Ponzi scheme. Accordingly, all of the Transfers are considered to be made with the actual intent for purposes of section 548(a)(1)(A).

## CONCLUSION

There are no genuine issues of material fact regarding the Plaintiff's *prima facie* case on

Counts I and III of the Amended Complaint. Accordingly, the only requirement that the Trustee needs to establish is that the transfer was made by RRA with actual intent to hinder, delay, or defraud any current or future creditor of RRA. For the reasons articulated above, the Court finds that RRA was involved and intertwined with the Ponzi and that the Transfers made to the Defendants were made with the actual intent to hinder, delay or defraud the current and future creditors of RRA.

Therefore it is

**ORDERED**:

1. The Plaintiff's Motion [D.E. 106] is **GRANTED**. The Defendant's Cross Motion for Summary Judgment [D.E. 118] is **DENIED.**

2. Judgment is entered in favor of the Plaintiff on Counts I and III of the Amended Complaint [D.E. 4]. The Transfers, as defined in the Amended Complaint, are all subject to avoidance pursuant to 11 U.S.C. § 548(a)(1)(A) and section 726.105, Florida Statutes.

3. Judgment in favor of the Plaintiff is without prejudice to any affirmative defenses the Defendants may have.

4. The Court will by separate order schedule a status conference in this matter.

###

Copies to:

Charles H. Lichtman, Esq.
Issac Marcushamer, Esq.
Jason Slatkin, Esq.